FRANK BRISCOE, complainant-respondent,

*v.*

FRANK A. O'CONNOR et al., defendants-appellants.

[Argued October 21st, 1935.   Decided January 31st, 1936.]

*Mr. Benjamin Newman* (*Messrs. Leber & Ruback,* of counsel), for the complainant-respondent.

*Messrs. Howe & Davis* (*Mr. Israel B. Greene,* of counsel), for the defendants-appellants.

The opinion of the court was delivered by

BROGAN, CHIEF-JUSTICE.

This is an appeal from a decree of the court of chancery which "perpetually restrained and enjoined" the defendants "from proceeding with the action at law commenced by them against complainant on or about September 12th, 1933, in the Essex county circuit court to recover the deficiency mentioned in the bill of complaint here [being an action on a bond dated January 26th, 1927, made by the complainant, Frank Briscoe, to Ridgewood Company, in the principal sum of $11,000, and thereafter assigned by said Ridgewood Company unto the defendant herein Frank A. O'Connor and thereafter assigned by the latter to the defendant The First National Bank of West Orange, a corporation], and from instituting and/or prosecuting any other suit, action or proceeding against complainant on said bond or to recover or enforce such deficiency or any part thereof."

The facts of the case seem to be that on January 26th, 1927, the Ridgewood Company, a corporation, sold a plot of land, situated in the village of South Orange, New Jersey, to the complainant, Frank Briscoe, for $21,000. As part of the purchase price Briscoe delivered his bond and mortgage in the sum of $11,000 to the seller, the mortgage containing the following covenant: "The party of the second part hereto [Ridgewood Company] hereby agrees to subordinate this mortgage to the lien of a new first mortgage to be obtained upon said premises, said new first mortgage to be in a sum not to exceed seventy-five (75) per cent. of the cost of the land and building to be erected upon the same."

The Ridgewood Company, on March 30th, assigned the bond and mortgage to the defendant Frank A. O'Connor and on the same day O'Connor assigned the bond and mortgage to the First National Bank of West Orange as collateral security for a loan.

The complainant, Briscoe, undertook erecting a new building upon the land and proceeded as far as excavating the cellar when, on June 1st, 1927, he conveyed the premises to Boyarsky and Gordon, Incorporated, a corporation, which completed the building. This corporation, in turn, sold the

premises to Lewis Construction Company, a corporation, which, in October, 1927, obtained from the Avon Building and Loan Association of the city of Newark a $70,000 mortgage, which mortgage was recorded. On May 5th, 1928, the Lewis Construction Company sold the premises to Benjamin Arywitz.

On November 30th, 1927, the building and loan association called upon O'Connor to execute a subordination of the mortgage owned by him in favor of the said $70,000 mortgage, owned by the building and loan association. He refused to do so at first on the ground that the building was incomplete, then for the reason that he was not required to subordinate in the amount requested and, finally, because he claimed that he was not required to subordinate at all. Shortly thereafter the $11,000 mortgage held by O'Connor became due. He demanded its payment and later filed bill to foreclose, treating the $70,000 building and loan mortgage as a junior encumbrance.

The building and loan association answered the bill, denied the priority of O'Connor's mortgage over its own, pleaded the subordination agreement and, by counter-claim, asked that O'Connor and the First National Bank, his assignee, be decreed to perform the covenant of subordination so that the priority of the building and loan mortgage would be established.

O'Connor challenged the answer and counter-claim. His motion to have them struck out was denied. This foreclosure case (*O'Connor* v. *Arywitz*), contested as to priorities and amount of subordination required by the mortgage covenant, was referred to the late Vice-Chancellor Backes for final hearing. At this juncture, the vice-chancellor sent the questions raised by the pleadings to a special master for determination. The special master sustained O'Connor's claim, finding that under the proofs and circumstances exhibited his mortgage was entitled to priority over the mortgage of the building and loan and, further, that the defendants in that cause had not made out the cost of the building to be more than $14,148. On exceptions to this report, the case found its way back to the vice-chancellor. He overruled the findings of the master,

holding that O'Connor was obliged to subordinate in an amount equal to seventy-five per cent. of the total cost of the land and building and fixed the amount to which it was binding upon O'Connor to subordinate at $64,500. See *O'Connor* v. *Arywitz, 112 N. J. Eq. 567.* All of this seems to have taken a very long time. O'Connor's foreclosure bill was filed on October 3d, 1928. The final decree bears the date, June 5th, 1933. The correspondence between counsel exhibits the causes of the delay, viz., engagements of counsel, efforts to adjust the controversy, and the like. In any event, the untoward postponement of the matter was no fault of O'Connor, nor does the complainant charge him with it.

Finally, the mortgaged premises were sold under the direction of the court and purchased by the first mortgagee, Avon Building and Loan Association, for a nominal sum. Thereafter O'Connor and the First National Bank began an action at law against Briscoe on his bond for the amount of the debt, plus interest. The complainant thereupon filed this bill to restrain the law action, charging that O'Connor breached the subordination agreement and persisted in the breach; that such conduct on his part was contrary to equity and good conscience; that but for the refusal to subordinate the property might have been sold long since under a decree of foreclosure or otherwise, at a time when such sale would have produced enough to have satisfied both mortgages, but that since the end of 1929, the real estate market has steadily declined so that the property, when finally sold, did not bring enough to satisfy the first mortgage; that the complainant, Briscoe, was in no way responsible for the delay and that the defendants, principally O'Connor, were; that O'Connor breached the covenant and his assignee, the bank, acquiesced therein.

After a full hearing, the court found that in 1929, the building and loan association offered to accept subordination in the amount of $60,000; that O'Connor refused to take a junior position in any amount; that he was answerable for an active interference with the rights of a superior lien holder and that he became "the actor in a proceeding which had for

its palpable purpose the avoidance of his solemn covenant and the defeat of the superior lien of the association's mortgage, and this by means that were wholly without support in law." And that, "the inescapable consequence of his effort was to prevent the sale of the property until such time when the property had greatly shrunk in value." The court further says, "O'Connor can hardly be regarded, in view of his willful breach, as an innocent party. His conduct in support of a breach of his covenant and in obstruction of the rights of others can hardly be palliated by the argument that O'Connor had a right to litigate his fanciful defenses. The right to litigate is not absolute. It has its qualifications, one of which is good faith."

Briscoe assisted O'Connor in the latter's effort to show that the building did not cost the amount claimed by the building and loan association and on this phase the court concluded that nothing that Briscoe did was such as to raise an estoppel against him. Hence the permanent injunction against the prosecution of the suit at law on the bond of Briscoe.

The question before us is whether, under the facts exhibited in the evidence before us, O'Connor's conduct, in litigating his asserted claims, was so unconscientious or inequitable as to justify raising an equitable estoppel against him.

We are unable to concur in the conclusion of the learned vice-chancellor in this respect that it was such.

In the first place, O'Connor acted under the advice of reputable counsel in the preliminary stages of the controversy involving the foreclosure of his mortgage. Initially, the master, a capable practicing attorney of very wide experience, to whom the cause was referred by the vice-chancellor, completely sustained the contentions advanced by counsel for O'Connor. True enough, the master's report was overruled by Vice-Chancellor Backes but it seems to us that the claims presented in that proceeding were not so obviously untenable as to remove them from the domain of things legally and factually debatable.

The premise for the vice-chancellor's conclusion is, and perforce must be, that O'Connor was not an innocent party and

that the litigation was not brought in good faith. The bill of complaint does not explicitly charge bad faith but does charge a persistent and unlawful refusal to subordinate and alleges a delay in the sale while there was a favorable market. But, it will be remembered, the bill to foreclose was filed on October 3d, 1928. At that time, according to the testimony, the real estate market was thriving and continued so for a much longer period than is needed for the termination of a contested case like *O'Connor* v. *Arywitz, supra*.

Reliance is placed upon the general principle that "when one of two innocent persons—that is, persons each guiltless of an intentional, moral wrong—must suffer a loss, it must be borne by that one of them who by his conduct—acts or omissions—has rendered the injury possible." But here the thing that occasioned the injury was the collapse of the real estate market. This condition followed in the wake of many a venture hopefully begun. The financial collapse caused the property to be sold for a pittance—not the law suit. To hold that the action of O'Connor caused the loss is an apparent *non sequitur*.

The elements that give rise to an equitable estoppel, which are pertinent to the facts under consideration, as set out by Mr. Pomeroy in his work on Equity Jurisprudence, fourth edition, volume 2, section 805, page 1644, seem to be absent in this case. There was no conduct amounting to a misrepresentation or concealment of material facts; there was no act, or failure to act, on the part of Briscoe, to his detriment, on the strength of anything that O'Connor said or did, or failed to say or do. He was not obliged to consent to a sale *pendente lite*. Briscoe neither did nor refrained from doing anything that changed his position for the worse. In fact, he aided O'Connor in an attempt to establish a lower cost for the building than the building and loan association put upon it. It is clear that the lower the cost, the less would be the building and loan mortgage and Briscoe would occupy a better position *pro tanto* on his bond obligation. Indeed if O'Connor had emerged successful in his contention that he was under no obligation to subordinate at all, Briscoe would have been per-

fectly secure as far as responsibility on his bond was concerned.

The late Chancellor Pitney stated the fundamentals of equitable estoppel *in pais* in the case of *Central Railroad Co.* v. *MacCartney, 68 N. J. Law 165, 175,* which has had the approval of this court on many occasions, as follows:

"1. That the party against whom the estoppel is urged has, on a previous occasion, by words or conduct, made a representation or concealment of material facts inconsistent with the facts forming the basis of his present claim.

"2. That such party either knew the facts to be otherwise than represented, or except for gross negligence would have known; or that he pretended to know the facts when he knew that he did not know them.

"3. That such representation or concealment was made either with the intent to influence the conduct of another or else was made under such circumstances that a reasonably prudent man would suppose it was intended to be acted upon as true.

"4. That the party to whom it was made was ignorant of the facts and had no convenient opportunity to ascertain them.

"5. That the latter party, in good faith, relied upon the representations or conduct of the other party and thereby was led into such a course of conduct that he will now be substantially prejudiced if the other party be permitted to repudiate his former action or representation."

It cannot be said that the complainant-respondent in this case was deceived as to what was going on or that any attempt was made to influence him in any way. He took his chances and waited for the determination of the controversy. The defendant tenaciously clung to what he believed to be his rights and the fact that the litigation was delayed was a circumstance that he could neither have anticipated nor by any action on his part stimulated. The success of O'Connor's contention would have been a consummation devoutly to be wished as far as Briscoe was concerned and, in his testimony, he frankly admits that his attorney participated in the contest as he (Briscoe) "wanted to get off the bond." Briscoe's

participation in the contest, while of some importance, is not controlling. Since he had a bond obligation he had a perfect right to be interested in keeping down the cost of the building, if he believed the cost was overstated, as apparently he did. Many questions have been argued on both sides of this case which, in our judgment, are beside the question.

In our examination of the record before us we have been concerned with whether the conduct of the defendant O'Connor was unconscientious or inequitable. We cannot find that it was. It follows therefore that it was error to have permanently enjoined him from suing on the Briscoe bond. At the conclusion of the hearing in the court of chancery, the bill of complaint should have been dismissed.

The decree is reversed.

*For affirmance*—None.

*For reversal*—THE CHIEF-JUSTICE, LLOYD, CASE, BODINE, DONGES, HEHER, PERSKIE, HETFIELD, DEAR, WELLS, WOLFS-KEIL, RAFFERTY, JJ. 12.