Complainants are residuary legatees under the will of George K. Breintnall, who died testate in August of 1927. *Page 106 
Defendants are the executors, certain annuitants named in the will aforesaid and the Philadelphia Saving Fund Society, herein called the Society, a mortgagee holding a bond and mortgage executed and delivered to it by decedent during his lifetime, which bond is in the sum of $250,000, the mortgage covering property at Thirteenth and Arch streets in Philadelphia, Pennsylvania. The Society has filed a counter-claim wherein it seeks a decree that it is entitled to be paid the amount of its claim on the bond aforesaid.
The relief sought by complainant is now reduced to two issues, (1) a decree that the Society is not entitled to be paid any part of its claim under the bond and mortgage or, if any part thereof, the face of the bond less the fair value of the mortgaged premises; (2) a decree that certain assets in the hands of the executors, derived from the sale of Pennsylvania real estate, are not subject to the claims of the Society in any event.
The issues are argued by complainant under four heads, (1) claimant is barred from asserting its claim against the estate by the application of the doctrine of equitable estoppel; (2) equitable principle of marshaling requires that the claimant proceed against the real estate covered by its mortgage, and credit the fair value thereof upon its debt, before proceeding upon its bond; (3) under the law of Pennsylvania, the Breintnall will does not work an equitable conversion of land into personalty; for under the law of Pennsylvania the claimant cannot claim against the proceeds of sale of Pennsylvania real estate, not having preserved its lien by bringing and indexing a suit within the time required by the Pennsylvania statute.
Taking up the question of estoppel, a brief recital of the facts is necessary.
The bond and mortgage in question bear date June 10th, 1911, and became due and payable during the lifetime of decedent, who, during that time, continued to pay the interest thereon when due, and his executors continued to do so until December 10th, 1935. The Society, during all these years, was content with its security and did not call the principal. *Page 107 
During the years of 1932 and 1935 certain reductions were made in the interest rate by the Society, at the request of the executors. In June of 1934 the executors offered to deed the property to the Society in consideration of the cancellation of the bond. This offer was refused and in July of 1935 the Society paid over to the executors over $8,000 in cash for the purpose of paying delinquent taxes. Thereafter, on December 30th, 1935, the executors, without the repayment of these moneys, sold the mortgaged premises at public sale for the sum of $150, subject to the mortgage aforesaid, whereupon the Society took possession thereof as mortgagee upon default. On January 10th, 1936, the Society demanded of the executors the payment of the bond indebtedness in full and filed with them its proof of claim for that amount. The executors disputed the claim, whereupon suit was brought in the circuit court of Atlantic county, which suit was dismissed (on technical grounds not necessary to state). This dismissal was without prejudice to the filing of a new claim and the commencement of a new action. Thereafter the Society filed a new claim, including not only the amount of the bond aforesaid but the $8,000 advanced as aforesaid (the technicalities causing the dismissal aforesaid having been removed by the filing of the executors' final account). During the time between the dismissal of the suit aforesaid and the filing of the new claim thereafter, the executors and the Society were endeavoring to settle any liability under the bond, and one of the purposes of the filing of this bill was to enjoin such a settlement. It may be noted that all parties conceded that the proposed settlement is not now a possibility and that there is no need for injunctive relief.
On March 14th, 1928, a decree to bar creditors was duly entered. It is admitted, however, that the executors have a surplus of funds in their hands for distribution and it is to this surplus that the Society looks for payment. R.S. 1937,3:25-10 and 3:25-11.
The basis of the argument that the Society is estopped is that by reason of its not having asserted its claim for principal at the early stages of the management of the estate by *Page 108 
the executors, at which time they allege they had ample funds with which to pay, the executors were lulled into a position of security and led to believe that the Society intended to rely on the security of the mortgaged premises and not look to the bond for payment; that had a claim under the bond been presented before the depression years, real estate and personal assets belonging to the estate could have been sold at fair prices that would have enabled the executors not only to have paid the Society in full but also would have enabled them to take care of all legacies, c., under the will.
Unquestionably, had the executors desired to pay the mortgage indebtedness within a year or two after the decease of Breintnall they had sufficient assets in their hands at the then market prices so to do and, unquestionably, had they desired or been compelled so to do they could and probably would have had to sell some real estate holdings which they retained, the value of which has since greatly depreciated. And in the light of after-events, it is almost a calamity that the executors were not compelled so to do or did not do so of their own volition. I will not recite the after-events which so demonstrate. Suffice it to say that the depression came on.
Neither party is responsible for these after-events but the question is, is the Society estopped by reason of its failure to insist upon payment of principal admittedly due prior to the death of Breintnall and at all times since?
I know of no principle of law which raises an estoppel against the Society by reason of its failure to insist upon payment of the moneys which were admittedly due and payable to it from decedent's estate and conclude from the evidence that the Society was glad to rely upon the security of the mortgaged premises, to collect its interest payments, which the executors promptly paid, and that it continued in this state of mind until it became apparent to it that the security had depreciated below the indebtedness, interest payments ceased and the executors sold the premises at public sale, being at that time in default of interest and taxes, at a nominal bid.
It is also clear that the executors, at all times, were well pleased with the attitude of the Society in not calling the *Page 109 
principal. They knew of the indebtedness and that it was due and callable, as is evidenced by their knowledge of interest installments and the payment thereof. The executors thought, no doubt, that their best course was to retain the real estate they did not dispose of. (They sold, shortly after the expiration of the year after decedent's death, real estate to the extent of $700,000, keeping the mortgaged premises, as well as the premises situate at Park Place and Pacific avenue in Atlantic City.) The property at Thirteenth and Arch streets in Philadelphia was then inventoried at $675,000 and the Park Place property at $265,000. There was, during these years, apparently no reason why the Society should call for the payment of principal or the executors desire to pay it. Neither party knew it, but they gambled with the depression which ensued.
The statutes, it seems to me, fix the rights of the parties,i.e., the Society, in not calling for the payment of its debt, assumed a risk, i.e., they might be barred from participating in the general assets of the estate for the payment of the debt by an order barring creditors, and so it turned out, but they still retain various other remedies, as follows: (1) the right to sue legatees upon refunding bonds filed by them (R.S. 3:25-17, formerly Orphans Court act, section 78); (2) the right to sue legatees to the extent of their legacies, whether or not they have filed refunding bonds (Carter v. Fidelity Union TrustCo., 120 N.J. Eq. 578; 187 Atl. Rep. 334); (3) the right to collect from an executor out of assets not accounted for by an executor after final settlement of an executors account (R.S.3:25-10, formerly Orphans Court act, section 70); (4) the right to collect out of a legacy or distributive share which has not been attached in the hands of an executor (R.S. 3:25-15, formerly Orphans Court act, section 77, construed in Cunningham
v. Stanford, 69 N.J. Law 9; 54 Atl. Rep. 245), to be available only after final settlement of an executor's account; (5) the right to collect out of "a surplus" remaining in the hands of an executor to be distributed "when an executor * * * has obtained a decree settling his decedent's estate" (R.S. 3:25-11, formerly *Page 110 
Orphans Court act, section 72); (6) the right to sue heirs or devisees to the extent of the real estate inherited or the value thereof (R.S. 3:25-68).
If the Society is to be barred by reason of the fact that it did not file its proof of claim at the early stages of the management of the estate and is thereby guilty of laches, as claimed by the executors, it is also barred of its statutory remedy to look to the assets now in the hands of the executors after the executors have obtained a decree settling the decedent's estate and prior to any distribution of said surplus.
In Briscoe v. O'Connor, 119 N.J. Eq. 378;182 Atl. Rep. 855, Chief-Justice Brogan, delivering a unanimous opinion for the court of errors and appeals, restated the fundamentals of equitable estoppel in pais, as they had been laid down by Chancellor Pitney in Central Railroad Co. v. MacCartney,68 N.J. Law 165; 52 Atl. Rep. 575.
Without restating those fundamentals, I cannot find (1) from the evidence in this case that the Society, by words or conduct, has made a representation or concealment of a material fact inconsistent with the facts forming the basis of its present claim; (2) nor that it ever represented in any way by its conduct that it in any respect waived the security of its bond, or that its failure to file its claim promptly was the result of an intent to influence the conduct of the executors, or that the mere neglect on its part to file its claim gave the executors the right to suppose it intended at any time to waive the security of the bond. I do find that the executors at all times were in complete knowledge of the fact that the debt was due and callable at any time, and that both parties were acting in good faith at all times prior to default on the part of the executors.
The next point argued, complainants say, comes within the principle of marshaling of assets.
At the outset it should be noted that the complainants contend that not only should the Society be compelled to proceed against the real estate covered by its mortgage before collecting on its bond, but that it should "credit the fair value thereof upon its debt." *Page 111 
In urging that the Society credit the fair value of the mortgaged premises, complainants rely on Federal Title andGuaranty Co. v. Lowenstein, 113 N.J. Eq. 200;166 Atl. Rep. 538, and Young v. Weber, 117 N.J. Eq. 242;175 Atl. Rep. 273, and kindred cases.
Passing the question as to whether there is evidence before me which would justify the application of the theory of the above cited cases, i.e., to show (1) nominal bidding plus the absence of competitive bidding, due to some fact beyond the control of complainants; (2) the existence of an emergency because of which the executor would be unable to protect itself at a sale by refinancing or otherwise; and (3) lack of financial resources to protect itself at the sale; we take up the fundamental question as to whether the doctrine of marshaling should be applied to the factual question in the case presented by the pleadings and evidence.
It is argued that the Society has invoked the aid of this court and, seeking equity, must do equity, and there is no question but that it is the duty of the court to apply it (the maxim) in any case where its application is necessary to the doing of justice.Mutual Benefit Life Insurance Co. v. Brown, 30 N.J. Eq. 193
(at p. 199). It matters not that there have been no direct adjudications in this state on the question of the right of legatees to have the benefit of marshaling against a specialty creditor, nor would it matter had there been no decisions in our sister states. If by invoking the doctrine of marshaling the Society will not be deprived of that which it says it wants, satisfaction of its claim and not double satisfaction, equity will so decree.
There are reported cases in other states in which the question has been passed on with a result favorable to the right of the court to marshal as between a mortgage creditor and legatees. Lord Eldon, Lord Chancellor of England, in Aldrich v. Cooper,8 Ves. Jr. 382; 18 E.R.C. 198; 32 Eng. Reprint 402, as far back as 1802 pointed out the true rule and that case has been consistently followed by courts of the United States up to the present time; and Chief-Justice Beasley, for the court of errors and appeals, in Herbert v. *Page 112 Mechanics' Building and Loan Association, 17 N.J. Eq. 497,
which case is not directly in point, held:
"It is obvious that the legal right is in the complainant, the building and loan association, to appropriate whichever fund it may see fit, and thus disappoint, at will, either claimant. The second mortgagee and the judgment creditors both, as their sole means of protection, apply to the power of the court to control this arbitrary discretion of the company, and conform it to the standard of equity. As the court is thus bound to arbitrate and dispense these funds among the rival litigants, the sequence would seem to be undeniable, that such distribution must be altogether equitable and in strict harmony with the maxims which prevail in a court of conscience."
He then cites (at p. 502) the case of Hanby v. Roberts,Amb. 128, as authority for the proposition that:
"The equity of the legatees as it existed at the death of the testator, to require the specialty debts to be raised out of the land, in which they have no interest, instead of out of the personalty, which is the fund to which they look for payment, cannot be defeated at the mere volition of a creditor."
In Rice v. Harbeson, 63 N.Y. 493, the court held:
"According to these general rules the application made to the surrogate that the avails of the personal property of the deceased be appropriated to the payment of the mortgage should have been denied, and the appellate court was justified in directing that the decree be modified so that the applicant first exhaust the real estate upon which it was a lien. This would not affect injuriously the rights of the holder of the mortgage, as after the real estate was exhausted by a foreclosure of the lien he would still be entitled to collect any deficiency which might arise upon a sale, by a resort to the personal estate."
So much, then, for the authority of the court to adopt the doctrine of marshaling as between the parties.
One of the rules of this doctrine is that relief will not be given if it will prejudice the rights of the person against whom the doctrine is asserted, which is tantamount to holding that the doctrine will not be asserted unless it may be equitably *Page 113 
asserted, in other words, that relief will not be given if it will delay or inconvenience the paramount encumbrancer in the collection of his debt or prejudice him in any manner. Pom. §2289, further discusses this principle.
The evidence discloses that payment of the Society's claim would seriously deplete the available assets of the estate but the Society says — pay us out of those assets and you may have our security for the payment of the debt. In fact, they say — while it may be true that you cannot protect yourself at a sale, you can sell your other assets and pay us for the security which we now have for our debt. To compel us to credit the fair value of the property, as that fair value may be ascertained by evidence, you are likewise asking us to take over the property. Our bond is an evidence of debt and we are entitled to its payment. We are not required to take over the property. We did not buy it, we merely took a mortgage on it as security. They further point out the fact that the final account of the executors of June 3d 1938, shows a balance of corpus in their hands amounting to $507,872.50 and a balance of income amounting to $12,320.95, less $26,500 administration expenses, and insist that the Society's claim should be paid out of these assets, leaving to the legatees not only any balance therein (if any) but the mortgaged property, free of the mortgage. They resort to the principle tersely stated by the late Vice-Chancellor Backes: "Debts must be paid before gifts." Home Brewing Co. v. Mahler,92 N.J. Eq. 323; 112 Atl. Rep. 506.
The doctrine of marshaling, as heretofore pointed out, does not permit hindering or delaying or imposing hardships on paramount creditors and in the instant case it is not the sale value of the property that is asked to be set off against the bond indebtedness, but the fair value, to be ascertained, thus tacitly admitting that the paramount creditor will have to look to the real estate as security for the greater part of its claim until the event of an improved real estate market in order that it may eventually be paid the amount of its debt. This is an unconscionable demand. It makes the paramount creditor assume a burden not imposed by law and one that *Page 114 
the executors or the legatees themselves are not willing to assume. The executors are not doing equity in insisting upon it. The paramount creditor is doing equity when it offers to turn over its security upon payment of its debt.
The legatees represented by the executors received their estate under the terms of the will, impressed with the trust that the debt should be paid. What the legatees now ask is that the paramount creditor be further delayed in the collection of his debt for an extent of time unknown, depending upon improved economic conditions, in order that he, the legatee, may receive his legacy or a portion thereof, relieved of that which the testator imposed upon his legacy, to wit, the payment of the full amount of the bonded debt. This court will not so decree.
The next question is, are assets in the hands of the executors liable to the payment of the Society's debt?
It is claimed that a large part of the cash assets remaining in the hands of the executors resulted from the sale of real estate located in Philadelphia, Pennsylvania, belonging to the testator at the time of his death. The executors say that by virtue of the law of Pennsylvania the Society cannot claim payment out of the avails of the sale of Pennsylvania real estate because it did not preserve its lien on the land, as required by the Fiduciaries' act of that state.
It must be remembered that decedent directed that all of his just debts be paid; that he was domiciled in the State of New Jersey at the time of his death; that the will was probated in this state; that the ultimate distribution of the funds in the hands of the executors is to be paid to those entitled thereto and that that distribution will be in accordance with the laws of the State of New Jersey.
It would seem that the cases of Jenkins v. Guarantee Trustand Safe Deposit Co., 53 N.J. Eq. 194; 32 Atl. Rep. 208, andWestfield Trust Co. v. Beekman, 97 N.J. Eq. 140;128 Atl. Rep. 791, answer the question in favor of the Society. In theJenkins Case, the court of errors and appeals held:
"The law of the situs of this land merely regulates its sale, when that shall take place as provided in the will, and the *Page 115 
passage thereof to the purchaser. That is all. It has nothing to do with the distribution of the proceeds of such sale among the creditors and legatees of the decedent. That distribution is regulated by the law of the testatrix' domicil, which, at the time of the making of her will and of her death, was Pennsylvania."
In the above case the situation is reversed from the case at bar, in that the land was situate in New Jersey and the testatrix domiciled in Pennsylvania.
In the Westfield Case, Vice-Chancellor Fielder, whose opinion was affirmed by the court of errors and appeals, said:
"The rule as to equitable or notional conversion of real estate into personalty is, that when a testator has given positive direction to his executor to sell his real estate and distribute the proceeds as money, or the provisions of the will require the executor to exercise his power of sale, the real estate will be considered as having been converted into money as of the date of the testator's death. If the executor is given merely an authority to sell in his discretion, the real estate retains its character as land until it is actually sold, but, when sold, the proceeds thereof becomes personalty and pass as such."
Applying the law as above quoted, we find that there was no positive direction to sell in the Breintnall will, but that there was an authority to sell, in the discretion of the executors; that there was such a sale or sales and that the proceeds in the hands of the executors after the sale of the real estate became personalty and are liable for the payment of decedent's debts.
It would seem, therefore, that the Fiduciaries' act of Pennsylvania is not applicable to the proceeds of the sale of Pennsylvania real estate now in the hands of the executors, but that these moneys are to be considered as personalty and to be distributed in accordance with the New Jersey law. But even if the law of Pennsylvania governed, I think the Breintnall will accomplished an equitable conversion.
Both sides agree "that if land is converted into personalty by the will, there is no lien on the land, and the creditor may *Page 116 
present his claim against the proceeds of sale of the land in the hands of the executor."
Under the law of Pennsylvania, as set forth in Hunt v.Lehman's Appeal, 105 Pa. 128 (cited by all parties) the court said:
"It ought to be settled by this time that in order to work a conversion, there must be either: first, a positive direction to sell; or, second, an absolute necessity to sell in order to execute the will; or, third, such a blending of real and personal estate by the testator in his will as to clearly show that he intended to create a fund out of both real and personal estate and to bequeath the said fund as money. In each of the two latter cases an intent to convert will be implied."
It seems to me clear, from a reading of the entire Brientnall will, together with the factual situation presented by the evidence and exhibits in the case, that Breintnall intended an equitable conversion because the pecuniary legacies, in the amount of $266,000, exclusive of annuities worth $11,900 annually, and debts and administration expenses of $235,802, excluding the $250,000 bond and mortgage in question, in comparison with the personal assets, the gross value of which is but $346,354, clearly indicates that testator well knew that his personal estate could not in any event satisfy the money legacies as well as the annuities of $11,900 set up in the third codicil. His real estate was valued at $1,715,000 (inventory). It is obvious, therefore, that there was an absolute necessity that some of decedent's real estate be sold to satisfy pecuniary legacies and this the executors accomplished in 1928 by selling the property at Eleventh and Chestnut streets for $490,000, $90,000 in cash and $400,000 ground rent; in 1929 the Twelfth and Sansom streets property for $215,000, $65,000 cash and a mortgage for $150,000. They determined to hold the remaining real estate assets for sale at prices which to them seemed the best obtainable.
The will discloses that it is only in the fifth and eleventh clauses thereof that the verb "devise" is used by the testator. In the fifth clause he devises to servants a dwelling house. In the eleventh clause he says: "I give, devise," c., the *Page 117 
remainder of his estate, "real, personal and mixed," to his trustees, to pay the net income to his wife during her lifetime, and at her death the will provides, first, that the trustees "distribute and pay over out of the residue of principal and any unexpended income" $230,000 to various legatees, and after doing that, he says: "I order and direct the remaining residue of principal and unexpended income be distributed and paid over" to six charitable institutions.
Thus, in paragraph 11 testator used the verb "devise" as necessary in a gift to his trustees of that part of his estate left over after paying his debts and satisfying pecuniary legacies to the extent of $230,000 and then, in directing the trustees as to the disposition of the remaining estate after the death of the life tenant, he says: "distribute and pay over," and when this is done he again orders his trustees to "distribute and pay over" to six charities without, in either instance, using the verb "devise."
The subsequent codicils did not affect any change in these bequests but did add an additional burden on the assets of the estate by the creation of annuities in the sum of $11,900 a year, and it will be observed that the testator did not direct the manner in which these annuities were to be paid, i.e., how the executors should secure their payment.
In the third codicil of his will testator again referred to the devise to his servants and made an additional bequest.
It is obvious that the testator knew the significance of a devise as distinguished from a bequest and that he spoke of the residue after the death of his wife as a bequest and not as a devise.
Outside of the necessity to sell in order to carry out the provisions of the will, it is clearly evident from the will that he intended to create a fund out of both real and personal estate and bequeath that fund as money. He bequeathed $131,000 in money by the clauses of his will preceding the eleventh clause. He blended real and personal property as a trust fund for his wife. He bequeathed $135,000 of the remainder of that fund after her death and ordered the balance of the blended fund "distributed and paid over" to six *Page 118 
charitable institutions. This ultimate residue was that which was left of his estate after providing for the eleven annuities and at the death of these annuitants he evidently intended thecorpus of the investments set up by the trustees to pay the annuitants to go to charities, but the trustees might well have bought and paid for annuities out of the estate.
It seems evident that the power of sale given under the will was because Breintnall knew it would be an absolute necessity in order to carry out the terms thereof.
On this branch of the case I am furnished with many conflicting authorities of the Pennsylvania courts as to when an equitable conversion arises, but it would seem that a review thereof is unnecessary, inasmuch as the fund in hand arises out of an exercise of a "mere authority to sell" and the proceeds of the sales "become personalty and pass as such." Westfield Trust Co.
v. Beekman, supra.
A decree may be entered on the Society's counter-claim for the amount of its debt, payable out of the undistributed assets in the hands of the executors, providing for the surrender by the Society to the executors of the bond and mortgage upon payment thereof. *Page 119