**In the Matter of NEW WOODBRIDGE BARREL & DRUM CO., INC. and Beacon Steel Drum Corp., Corporations of the State of New Jersey, Debtor.**

Bankruptcy No. 84–03815.

United States Bankruptcy Court,
D. New Jersey.

Dec. 5, 1988.

Slavitt, Fish & Cowen, P.A. by Benjamin J. Slavitt, Newark, N.J., for Sussex Barrel & Drum, Inc.

Kramer, Eisenburg & Fisherman by Marvin E. Kramer, for Max Rubenfeld, as Assignee of Emanuel Heller.

Crummy, Del Deo, Dolan, Griffinger, & Vecchione, P.C. by Donald H. Steckroth, Newark, N.J., for the debtor-in-possession, New Woodbridge Barrel & Drum.

### OPINION

VINCENT J. COMMISA, Chief Judge.

This matter comes before the Court on the Motion of Sussex Barrel and Drum, Inc., to compel the Debtor New Woodbridge to honor the contract of sale for commercial property between itself and Sussex Barrel & Drum Co., which New Woodbridge claims is no longer valid. At the heart of Sussex' motion is its contention that the mortgagees of the property at issue should be compelled to marshall the assets of the debtor so that foreclosure will not destroy Sussex' ability to purchase the property. This Opinion, which will address Sussex' contention, will constitute the Court's Findings of Fact and Conclusions of Law pursuant to Bankruptcy Rule 7052.

The New Woodbridge Barrel and Drum Co., Inc. operated a steel drum plant in Newark, New Jersey for the purpose of reconditioning and selling metal drums. On July 16, 1984, the company filed a voluntary petition under Chapter 11 of the Bankruptcy Code. As part of the company's liquidation, New Woodbridge agreed to sell this commercial property, as reflected in an order approving the sale dated August 22, 1985. The company's two principal shareholders, Martin Winowitz and Lawrence Moshen, are also bankrupt, having filed petitions for relief under Chapter 13 on May 1, 1987, and under Chapter 11 on May 4, 1987, respectively.

The present dispute arises from a contract to sell the company's commercial property to the Sussex Barrel and Drum Company. In sum, Sussex asks that New Woodbridge be directed to perform the sale, while New Woodbridge claims the contract is no longer valid. In addition to the contract dispute, Sussex may lose all ability to purchase the property if the property's mortgagee, Max Rubenfeld, forecloses on the commercial property.

In 1979, Moshen and Winowitz purchased all shares in New Woodbridge from Emanuel Heller, then owner of all common stock. In order to satisfy the $330,000.00 purchase price, Heller retained a mortgage on the commercial property in Newark. Moshen and Winowitz collaterized the mortgage by taking separate mortgages on their individual homes. As a result, Heller could satisfy his claim as mortgagee from either the lien on the commercial property or the lien on the homes of the principals of the corporation.

On May 12, 1986, the value of the lien on the commercial property was fixed at $250,000.00. In addition, in November 1987, Heller's liens on all property were assigned to Moshen's father-in-law, Max Rubenfeld ("Rubenfeld").

On August 22, 1985, as part of the liquidation plan, the court approved the sale of the commercial property to Sussex. The purchase price was $315,000.00. There were no other offers for the property. The contract provided that the property would be with valid liens attaching pursuant to 11 U.S.C. § 363. Thus, Sussex would have to satisfy Rubenfeld's lien as part of the purchase.

Additionally, the contract provided that transfer could not occur if the property was not in compliance with the provisions of the Environmental Cleanup Responsibility Act. N.J.S.A. 13:1K-6-9 ("ECRA"). ECRA compliance ensures the buyer that the property is free of environmental hazards. The buyer and seller, in this case, agreed to limit New Woodbridge's ECRA liability to $15,000.00. New Woodbridge could terminate the contract if the cost of ECRA compliance exceeded that level, and if Sussex refused to pay the additional cost.

The term limiting the seller's ECRA liability created the current dispute. New Woodbridge expended an initial $4,000.00 for payment to an independent testing firm, Acu–Tech. The search by Acu–Tech revealed the need for another $20,000.00 expenditure for the seller to comply with the statutory provisions. On July 13, 1987, New Woodbridge terminated the contract by written notice to Sussex.

However, a letter dated February 18, 1987, confirms the terms of a plan by the parties to cover the additional ECRA cost. Sussex permitted New Woodbridge to draw funds from its $31,500.00 deposit for the purchase of the property. In addition, Sussex agreed to increase the purchase price by $10,000.00. Sussex agreed to the advances from the deposit as long as the final purchase price was offset by the advances. Sussex contends this constituted a waiver and novation of the original term limiting the seller's ECRA liability, with the funds advanced from the deposit and the increased purchase price representing consideration for the modification.

The ECRA procedures covered a two-year span. New Woodbridge claims that it encouraged an amicable resolution to the disputes and, additionally, had always encouraged Sussex to take possession of the property. Sussex contends that New Woodbridge caused delays with regard to the complete ECRA testing and charges Moshen and Winowitz with inducing the

mortgagee, Heller, to foreclose on the commercial property. When these shareholders did not make payments to Heller, Heller moved to vacate the stay and proceed with foreclosure.

In August 1987, New Woodbridge found a new buyer for the property. The TAH Development Corporation offered to purchase the property for a sum greater than that specified in the Sussex purchase agreement. However, that offer was withdrawn when the New Jersey Department of Environmental Protection reported dioxin contamination of the soil.

At present, Sussex is asserting rights as an equitable owner of the property and asks that the mortgagee, Rubenfeld, be compelled to marshal Moshen and Winowitz's assets. If marshalling does not apply, and Rubenfeld decides to foreclose, Sussex will lose all ability to purchase the commercial property. If marshalling is compelled, Rubenfeld will be forced to satisfy his claim from his lien on the individuals' homes. In order to properly address this matter, the Court must analyze the doctrine of marshalling.

Marshalling is founded in equity. It is not based on the laws of contracts or liens, but instead is grounded on principles of fairness and justice between creditors with unequal interests. *Meyer v. United States*, 375 U.S. 233, 237, 84 S.Ct. 318, 321, 11 L.Ed.2d 293 (1963); *Sowell v. Federal Reserve Bank*, 268 U.S. 449, 45 S.Ct. 528, 69 L.Ed. 1041 (1925). The equitable doctrine of marshalling applies when two creditors have claims against a common debtor. When a senior creditor can elect to satisfy his claim from one of two available funds, and a junior creditor has access to only one of those claims, a court can compel a senior creditor to resort first to the fund unavailable to the junior creditor. *Meyer, supra,* 375 U.S. at 237, 84 S.Ct. at 321; *Sowell, supra,* 268 U.S. at 456–57, 45 S.Ct. at 530–31. The traditional elements of marshalling are that the two lienholders must be creditors of the same debtor; that there are two funds belonging to the debtor, that only one creditor has access to both funds; and that the senior creditor or third parties

are not prejudiced by the application of the doctrine. *In re Oransky*, 75 B.R. 541, 543 (Bkrtcy.E.D.Mo.1987), *reh'g denied* July 21, and Aug. 13, 1987. In addition, at least until recently, another requirement is that the invoking creditor must be a secured creditor. Davis, *Marshaling of Assets in Bankruptcy*, 5 Bankr.Dev.J. 309 (1987). These elements, and the circumstances under which marshalling may be invoked, have remained relatively unchanged for a number of years. However, in light of the fact that marshalling is an equitable, rather than legal, doctrine, courts in recent years have been liberal in expanding the doctrine to satisfy both creditor and debtor requirements.

In the case at bar, expansion of the doctrine with regard to two of its elements is crucial to Sussex. First, because the first fund, (*i.e.*, the commercial property) originates from a different source from the second fund (*i.e.*, the personal property of Moshen and Winowitz), this Court must be convinced that circumstances exist which would warrant treating the two different funds as though they were owned by a common debtor. Second, since Sussex' intention is to compel performance of the contract, the Court must also be convinced that Sussex' interest as an equitable owner of the property, which arises through its contract for purchase, is tantamount to the interest of a secured creditor, which is generally required before marshalling may apply. The Court will address each of these issues in its discussion below.

## I. EXPANDING THE COMMON DEBTOR CATEGORY.

██ In certain limited situations, when an individual shareholder guarantees a corporate debt, courts utilize equitable considerations to expand the doctrine of marshalling by deviating from the "common debtor" requirement. If some connection exists between the individual and corporate debtors to justify treatment as a common debtor, then the requisite that the funds originate from a single source may be waived. The seminal case illustrating this point is *Jack Green's Fashions For Men–Big and Tall*, 597 F.2d 130 (8th Cir.1979).

In *Jack Green's*, a corporate bankrupt took out a mortgage which was secured by liens on the business assets of the corporation, as well as by personal property of the two individual shareholders of the corporation. Subsequent to the filing of voluntary petitions by both the corporation and the two individual shareholders, the trustee appointed to the estate liquidated the business assets of the corporation. The amount realized from this liquidation was $28,000.00. At the time the balance due to the bank was approximately $65,000.00, and the value of the personal real estate subject to the bank's lien was around $135,-000.00. The trustee, seeking to protect unsecured creditors from an avoidable loss, filed an application with the bankruptcy court for an order requiring that the bank which held the mortgage be compelled to proceed first against the real estate owned by the individual shareholders, rather than against the business assets of the corporation. Emphasizing the bankruptcy court's role as a court of equity, the Eighth Circuit held that it would be "in the highest degree inequitable to allow the bank to exhaust the business assets of the corporate bankrupt without looking to the real estate mortgaged to it. *To permit such a course would leave the general creditors of the business with nothing." Jack Green's, supra,* 593 F.2d at 133 (emphasis added).

It is clear that in *Jack Green's*, the fact that the secured creditor's debt could not even be 50% satisfied out of the corporate assets was a determinative factor in the court's holding. Thus, although Sussex urges the Court to accept its contention that the case at bar is completely analogous to *Jack Green's*, the Court, upon comparison of the factual background of the two cases, must disagree. The corporation in *Jack Green's* owned no real estate, hence, the bank relied on the real estate of the individual shareholders as security for its loan. In the instant case, New Woodbridge owned its corporate property. The guarantees given by the individual shareholders were given in case the value of the corporate property diminished, not as primary security for the loan. Therefore, unlike *Jack Green's*, the mortgage assignee's

entire debt can be satisfied from the corporate assets, thereby rendering recourse to the individual property unnecessary. The Court is thus unpersuaded by Sussex' argument with regard to *Jack Green's*.

However, there are other situations in which courts have waived the common debtor requirement where individual shareholders have guaranteed a corporate debt. In *Farmers and Merchants Bank v. Gibson*, 7 B.R. 437 (N.D.Fl.1980), the trustee of a bankrupt car dealership moved to compel marshalling against a secured creditor. The creditor had obtained a lien on the principal shareholder's home. Since the loan was obtained for working capital, the court said the shareholder's right to limited liability for the corporate debt became inferior to the corporation's creditor's right to marshal his personal assets. *Id.* at 440. The shareholder's personal action commingled with the corporation's activity to such an extent that principles of equity justified piercing the corporate veil. Other courts have also recognized this "working capital" exception. *See, In re Computer Room, Inc.,* 24 B.R. 732 (Bankr.N.D.Al.1982); *Matter of Multiple Services Industries, Inc.,* 18 B.R. 635 (Bankr.E.D.Wis.1982).

The New Woodbridge Corporation gave the mortgage to Emanuel Heller to satisfy the balance due Heller for the purchase of all corporate stock. Moshen and Winowitz, as individual shareholders of the corporation, did not guarantee a loan for the corporation's working capital. Under the *Farmers and Merchants Bank* rule discussed above, the shareholders' right to limited liability from the corporate debt is not inferior to any right Sussex has to marshal the shareholders' personal assets. *See Farmers and Merchants Bank,* 7 B.R. at 441.

In addition, a shareholder's fraud or misconduct will justify piercing the corporate veil and hold a guarantor-shareholder liable for his corporation's debt for marshalling purposes. *In re Tampa Chain Co., Inc.,* 53 B.R. 772 (Bkrtcy.S.D.N.Y.1985). In that case, the corporate principals guaranteed a loan obtained for working capital. However, further investigation revealed that proceeds were spent on personal expenses.

The misconduct by the guarantors was justification to disregard the shareholder's right to limited corporate liability and marshal personal assets. *Id.*, at 779. Other Bankruptcy Courts have followed this rule and have allowed marshalling of an individual guarantor's personal assets, if there has been some fraudulent act or misconduct on his part. *See In the Matter of Dealer Support Services International, Inc.*, 73 B.R. 763 (Bkrtcy.E.D.Mich.1987); *In re United Medical Research, Inc.*, ("*Stuhley*"), 12 B.R. 941, 944 (C.D.California 1981).[1] However, in the instant matter, there have been no allegations of fraud or misconduct which would justify piercing the corporate veil with regard to Moshen and Winowitz.

## II. THE CREDITOR REQUIREMENT AND AN EQUITABLE INTEREST IN LAND.

As discussed above, one of the elements of marshalling is that the invoking party be a creditor of the debtor. Sussex argues that, based on its contract with New Woodbridge, its equitable ownership of the property satisfies the creditor requirement.[2] This argument is premised on the proposition that the purchaser in an agreement for the sale of land becomes the equitable owner of the land, as if the contract had been performed. *Pasker v. Harleysville Mutual Ins. Co.*, 192 N.J.Super. 133, 136, 469 A.2d 41 (App.Div.1983); *Yeck v. Rietzke*, 33 N.J.Super. 371, 376, 110 A.2d 321 (App.Div. 1954); *Haughwout and Pomeroy v. Murphy*, 22 N.J.Eq. 531, 546 (E.E.A.1871). This proposition is not disputed, either by the Court or by New Woodbridge. However, the Court must determine whether this "equitable ownership" interest can be substituted for the creditor requirement.

A review of the case law reveals that the doctrine of marshalling assets has been extended to include cases where persons other than a creditor have had an interest in property. 53 Am.Jur.2d Section 8. Further extending the doctrine to include the equitable owners of property is consistent with the Supreme Court's promotion of fairness and justice. *See Meyer v. United States, supra.* Case law supports equitable owners of property possessing a right to compel marshalling to avoid injustices. However, the cases do not involve equitable owners of real property. In one instance, a legatee had a sufficient interest in the estate of the decedent to compel marshalling against the decedent's creditors. *Philadelphia Home for the Incurables v. Philadelphia Saving Fund Society*, 126 N.J.Eq. 104, 110–13, 8 A.2d 193 (1939). In another case, the purchaser's interest in stock vested with the contract for sale of the stock. *Martindale v. Fiduciary Counsel, Inc.*, 133 N.J.Eq. 408, 415, 30 A.2d 281 (1943).

As the Court has found no support for Sussex' contention that its equitable ownership of *real* property is tantamount to creditor status, this argument must be rejected.

In light of the foregoing, the Court finds that Sussex is not a "creditor" of New Woodbridge for marshalling purposes and that there is no justification for treating the corporate and individual debtors as a common source for such purposes. Therefore, Sussex has not met the requirements of marshalling as set forth above. Accordingly, Sussex' motion to enforce the contract of sale between itself and New Woodbridge is denied.

Submit the appropriate Order within ten (10) days of the date hereof.

1. The above-mentioned cases are critical of *Jack Green's Fashions'* equity arguments to waive the common debtor requirement. For policy reasons, *Stuhley* would not waive the requirement to benefit unsecured creditors. Although the court could marshal the guarantor's assets to attain what it considered equity, *Stuhley* emphasized the potential for injustice towards secured creditors and noted that unsecured creditors, in general, would receive little return on their claims under normal liquidation proceedings. *Matter of Dealer Support Services, Inc* ("*Stuhley*"), 73 B.R. at 766.

2. Although the validity of the contract is in dispute, the Court will assume, for purposes of this discussion, that the contract is still valid.